OJ Commerce v. KidKraft. Okay, Mr. Freedman? Good morning, Your Honor.  My name is Val Freedman. I represent the appellants in this case, OJ Commerce and Naomi Holm. Before you finish, there's one thing that has troubled me about this case, and it's the redactions. When we write an opinion in this appeal, we're going to have an obligation to ensure that the public understands the basis for our holding in general. The record is generally a public record, and there's a lot that's been redacted or filed under seal here where it's not clear to me whether the reductions are appropriate. On page 6 of your initial brief, you redact that OJ Commerce was a top 20 reseller of KidKraft products. I don't see the possible privacy interest that you can have in that information when it's years old and relates to a now terminated relationship. Do you agree with that? We do, Your Honor. We had a protracted fight about this in the district court. Those redactions are at the request of the appellee. We agree that that does not need to be redacted. In fact, the vast majority, we don't think there's any interest at all, and it caused a problem below . . . Is there anything that you would urge us absolutely has to be redacted? Not for appellant. Okay. Great. Thank you. Your Honor, this case is about wooden play kitchens. I've been blessed to have four children, so I knew what wooden play kitchens are when this case came across my desk, but they are . . . I soon realized I was up to speed with children's toys, so they are little wooden furniture pieces that look like model, tiny model kitchens with a little sink, a little microwave, a little oven, and children are meant to play, make, believe on them. KidCraft, the defendant in this case, is a monopolist in this market. Our expert says they control over 70% of the market. Their expert says it's at least 50% of the market. My client, OJ Commerce, is an e-commerce retailer, and it sold KidCraft's wooden play kitchens from 2011 to 2016, five years. The problem I have with this is that we've got a Section 1 claim and a Section 2 claim, and when it comes to the Section 1 claim, the two entities, allegedly two entities that are supposed to have conspired with each other, one is a majority owner of the other, controls, as best I can tell, can control and in many ways does control everything that it does, and they don't compete in this market. I just don't see how under Supreme Court precedent, those are two entities for purposes of Section 1. Let's deal with that claim first. Absolutely. So the first thing I just want to underscore from that is that there's a Section 2 claim regardless. We'll get to that in a minute, because then you have unilateral refusals to deal. Correct, under Aspen skiing. Yeah, and Aspen skiing, if you're traveling under Aspen skiing, we'll get to that in a minute. That is a tough road. I understand, Your Honor, but I think we check all the boxes of both Aspen skiing, this court's Estee Lauder case, and the Seventh Circuit's Via Media case, which just came out in 2020. But to answer your question on the copper weld issue, Your Honor, that's a factual question, right? The Supreme Court's decision was that- It looks like we know enough undisputed facts to where it's not, that we could decide as a matter of law, these are not two entities. Well, Your Honor, I'd say that MidOcean Partners, the parent company, or the now 80% owner, or then 57% owner, does not have control over the day-to-day decisions of KidKraft. One of the key things for me, and this is also a problem I'm having with this case, is that there's no, I mean, KidCo is the only division, if you will, or the only company that MidOcean owns that produces toys, right? So, there's no competition between the two. I mean, that seems to be a key point. This is for the Section 1 claim? Yeah. So, again, I understand the point the court is making, and I would argue that there isn't sufficient record evidence to show total dominion by the parent over- It doesn't have to be. Look, under the acquisition agreement, MidOcean appoints a majority of the seats on the KidKraft board, right? That's correct. MidOcean maintains control over the strategic direction of KidKraft and controls the hiring and firing of the executive officers, right? That's correct. Yeah. KidKraft requires MidOcean's prior approval to change the size of the board, appoint or remove officers, or enter into any transaction in excess of a million dollars, right? That's correct, but they do not, and I'm quoting the agreements, this is Documentary 131, Defendant's authority or power to act for or on behalf of the company in any manner, to do any act that would be or be construed as binding on the company, or to make any expenditures on behalf of the company. But I just, I'm cognizant of the time, Your Honor, I understand the issues you're pointing out with the copper weld issue, and I'd like to rely on, rest on the briefs and what we've said today, because I think it's very important to address the Aspen skiing, the Section 2 claims. Okay. Unless the court has specific other questions, I mean, I can't fight the factual record you just pointed out. That is true, Your Honor. So. So, if we're going to talk about Aspen skiing, I want to just direct you to what my concerns are there so you have an opportunity to address them. Aspen skiing, it seems to me, first of all, we know that Aspen skiing is at the outer boundary of what's allowed. So if it doesn't meet Aspen skiing, then we've got a problem, right? Would you agree with that? I do, Your Honor. Okay. So in Aspen skiing is somewhat of a unique situation, right, where there are a total of four mountains, three versus one, so it's really two entities competing with each other, and the three shut the other one out. But here, in this field, we've got what I think it's like 19 producers of kids' kitchens and, you know, Kidco has accounted for less than 1% of your client's business and your client accounted for only 1% of Kidco's business. I mean, it seems very different. It wasn't a situation where one or the other was going to be put out of business as a result of not dealing with the other. What am I missing here? That's why it seems different to me than Aspen skiing where, you know, their profits, I guess, were halved, right, as a result of the anti-competitive conduct of Aspen skiing. So in Aspen, there were two competitors and one was slowly losing market share but not being destroyed. I think there's a couple of important facts, which is this argument, to paraphrase, Your Honor, see if I've got it right, is essentially, well, Aspen only applies if it's going to Well, I think if it's going to, I wouldn't say go so far as to say completely eliminate, but I would say really impose some devastating consequences on. Okay. Because there it was halved. I mean, you would agree with that, right? I don't recall the percentage. I think it went from 20% to 11%. I trust the court has it right. I think the issue is that in Aspen skiing, first of all, there is no authority that says that there needs to be devastating consequences or what the devastating consequences are. In this court's opinion in Duty Free America, it laid out three factors for an Aspen skiing claim, a unilateral termination of a voluntary and profitable relationship, which is what we have here. KidCraft and OJ Commerce were in five years of profitable business. They were its top 20 customer, as large as its 13th by revenue. What we understand about that is what the Supreme Court tells us in Trinco, which is that in Aspen skiing, what they had was a cooperation for years in a joint offering. That's the words of the Supreme Court. Basically, they were in business together in a real sense, right? That's why the Supreme Court has said this is very limited application, is at the outer boundary and if it's not this kind of situation, don't tell us about Aspen, don't say Aspen skiing applies. We don't have that here. Well, I mean, I would argue we do, Your Honor. I mean, in Aspen, they had offered a joint ticket, but here, you know, millions of dollars had been sold between these two companies and they were in business together for five years and the only reason they're not jointly offering anything. Well, KidCraft was selling its kitchen through OJ Commerce. So OJ Commerce was offering the KidCraft kitchen. They were offering together the same kitchen. But look at the seven circuits via media case in 2020, right? In via media, you've got an issue where Comcast is controlling the interconnects and not allowing via media to come in and offer its services. There was no history of, you know, specifically Comcast and via media working together, except you needed the Comcast and you needed the interconnects in order to work. And historically, via media had been working with Comcast on the interconnects. So it doesn't have to be a joint offering as in Aspen. And when the when the seventh circuit in the via media case laid out the factors for an Aspen skiing claim, they said you need three things, a prior course of voluntary conduct, a sacrifice of short term profits and refusal to sell to rivals in the same year. Clients sales increase after the termination of the relationship. But the case was clear, your honor, that that's insufficient, right? I mean, they could have increased substantially more, not to mention there is clearly damage to competition here because the expert in this case reviewed the internal KidKraft documents showing that the prices increased to consumers after O.J. Commerce was cut off. And there. But let me ask you a question about that isn't isn't the record and maybe it's not uncontested. You can let me know if it is that the margins remain the same and that the costs increased because of the costs increased your honor. That's KidKraft contention for the very first time on appeal in front of the 11th circuit that was never raised in any of their briefs below. And we haven't developed a factual record on that. It's just not fair to put that in front of us. But I'd argue even if that is their contention, that is an argument for the jury evidence about it. I'm sorry. Is there evidence about it in the record there? Your honor, there's evidence in the record that their margins did that their retail margins increase. So, for example, we can see docket entry 131 tabby exhibit four is an internal KidKraft deck that says and I'm quoting pricing and segmentation allowed strategic partners to increase retail margin and market share while shutting others out of the market. That is literally what we're saying occurred here. They shut others out of the market and therefore they were able to increase their retail margins or docket entry 144 exhibit 28 is a KidKraft internal email from 2017 saying, quote, We are seeing the effects of increased pricing. Is there is there evidence that KidKraft's increased prices were super competitive, meaning that they were above competitive levels? So your honor, again, something raised for the very first time on appeal in front of the 11th circuit. Super competitive pricing is not raised in any of the briefs below that being said. And so it's waived now and it's unfair to make us argue, right? There's precedent. You can't move from a judgment on ground A and then win on Bound B that we didn't have a chance to respond to. That being said, Dr. Vander Hart plaintiffs expert opined that OJ Commerce was an aggressive discounter that used algorithms to constantly reduce price on massive e-commerce retailers, which created a race to the bottom as as OJ Commerce would reduce its price. So would the competitors. And that will go on and on and on. And because that would happen, price would be pushed down. And so the point of that is that a jury would be able to determine that that created a downward pressure on price. When that element was removed by a unilateral refusal to deal, prices increased. And in fact, Dr. Vander Hart opined that they did increase and KidKraft's internal documents show us that they did increase and that that increase that occurred is a super competitive price increase that wouldn't be able to be sustained if OJ Commerce was still in the market. Again, you know, that record wasn't developed. Despite the fact that your sales increased. Well, our sales increased because we then started pumping out what I would expect from super competitive pricing. Right. But what we're looking at is whether or not there is a harm to competition, not as well as a harm to us. Now, we would argue and I think we can put up evidence of this, that our sales would have increased significantly more had we not been subject to this to this issue. Right. But but the issue the district court ruled on was the district court said, sure, there's evidence of a price increase. That's insufficient. But that's just wrong as a matter of law. We're showing an increase in price. We're showing that prices went up through analytical financial data opined on by our expert. We're showing it through internal KidKraft documents. If you look at this court's pro caps decision, this court upheld a grant of summary judgment saying, hey, there's no evidence of harm to competition here, despite the fact that there's expert reports saying prices could have gone up. Because why? This court said because it was hypothetical. It was theoretical. There were no references to concrete examples of price increases. That is not what happened here. Here we are showing concrete examples of pricing. Problem. The problem is the point of antitrust laws is to be concerned with inter brand competition and all your evidence about increased prices is KidKraft? Which is an intra brand concern? I mean, Your Honor, I think the point of the antitrust laws would be to protect against a monopoly using super competitive pricing against consumers. Here you have an undisputed monopolist with over 70 percent of the market share at a minimum. The problem is the market wide unit sales, the market wide unit sales year on year following the termination increased. The amount of sales. I mean, we have internal documents from KidKraft showing that because of the termination of our client, they will not be able to meet their projections. So that they're actually their output was reduced, right? And that also that this is all OJ Commerce's claim. I remember Naomi Holm also you've gone over a fair amount of you've been answering questions from us. Why don't we hear from your adversary? Mr. Hungar. Mr. Hungar, you can if the redactions are at your request, and if there's something here that's really important in terms of redactions, I would certainly like to know what it is because I'm having a hard time seeing how most of them that we would have to deal with have any real legitimacy at this point. Yes, Your Honor. May it please the court. With respect to the redactions, of course, this case was filed years ago, closer in time to the relevant events. Some of the information, not the one, not the item you referred to, but some of the information was obtained from third parties, and obviously we don't have their consent to disclose it. And, of course, there's a protective order in place which explains the redactions. But certainly with respect to KidCraft data, at this point KidCraft would have no objection to the court referring to any of that redacted information in its opinion if the court deems it appropriate. With respect to the Copperweld case, I would just emphasize the clarity with which the Supreme Court has spoken to these questions and the clarity of the factual record here which makes clear the complete control. In Copperweld itself, the court noted that when a corporation creates a division or a subsidiary, it gives it a degree of managerial autonomy, but that doesn't mean that they are competitors or potential competitors because the corporation can step in and tell them what to do and they're all acting in pursuit of the same overarching interests. Precisely the same is true here, and therefore there's no basis for a Section 1 conspiracy on this undisputed record. With respect to Aspen Skiing, there are multiple crucial factors that were essential to the decision in Aspen Skiing and that are not present here, and therefore this case is miles beyond the outer boundaries of Section 2 liability in that case. As the Supreme Court in Trinko suggested, there was only one rival there, unlike a dozen or more here. There was cooperation between rivals that was necessary for competition to exist. You couldn't have competition, of course, in the normal case, obviously, competition among rivals is a bad thing, not a good thing in antitrust, so it's a very narrow exception. And also in via media, competition among rivals was necessary for competition, rather cooperation was necessary that the interconnects were created by competing cable companies getting together and creating this essentially marketplace through which all the advertising or much of the advertising was being sold, and therefore in order to compete for advertising services, you had to have access to this joint offering, and Comcast was allegedly excluding the sole competitor. So again, it's completely unlike this case. Obviously, the sales there of the plaintiff were steadily declining, not so here, and new entry was hindered, not so here, as we've explained in our brief. The record shows there were multiple new entrants into this market during the very time period that plaintiffs allege there was this dangerous conduct going on. So all those ways, Aspen skiing is far from this case, and therefore there's no Aspen skiing liability. With respect to the price increase theory, so plaintiff points to a couple items of evidence, one that talks about retail margin. That's a document talking about how by virtue of Kidd Craft's attempt to improve its relationships with key retailers and its efforts in that regard, its retail partners' retail margins were improving. That says nothing about Kidd Craft's prices. It says nothing about price increases. Retail margins can improve through increased sales, through volume discounts, through reduced costs because of improved distribution schemes and all sorts of ways. And in any event, there's no evidence in this record that even the plaintiff's expert does not claim to have any evidence showing, documenting any sort of market-wide increase in retail prices. That's simply not in the case at all. Plaintiff claims that these various arguments about pricing were waived because we supposedly didn't make them below. Here's what we actually said. With respect to pricing evidence, for instance, we said in our motion for summary judgment at page 2, docket entry 131, that plaintiff's case failed because they have, quote, no evidence of any constraint on supply or increased pricing on a market-wide basis, essential evidence to show harm to competition. And we cited in support of that proposition this Court's decision in Jacobs, which expressly requires evidence of market-wide super competitive pricing, the very standard that plaintiffs were obligated to meet and clearly have failed to meet. They don't even claim to have evidence of market-wide. Increase in prices of KidCraft, right? And the market-wide unit of sales actually increased. Correct. That's correct. Output increased in each year during the relevant time period. KidCraft sales and market share decreased in 2017. As they increased prices. But again, whether they increased prices even at KidCraft is disputed, but whether they did or not, the point is the market is working. The termination of OJC had no negative impact on competition. OJC's sales increased in 2017. Nahomi Holmes' sales increased in 2017. KidCraft's sales decreased in 2017. Rival's sales increased in 2017. The overall market increased in 2017. It's like the weakest possible case for any claim of any adverse market impact and plaintiffs have nothing to the contrary. The other arguments they make about waiver are similarly incorrect. The evidence of KidCraft's alleged price increase, they argued that in their opposition to summary judgment in our rebuttal expert report, in our rebuttal statement of undisputed facts, we specifically contradicted our expert on rebuttal offered the evidence that shows that in fact even the claim of an average price increase by KidCraft in 2017, once you factor in increased costs, the fact that their margin, their profit margin did not increase, and the fact that what changed that explains the average cost increase is that the product mix of wooden plate kitchens changed, so they were selling more of the higher priced and more costly items, so yes, their average price increased, but that doesn't prove they increased prices overall throughout that year. So even that claim is not supported by the record, but even if it were, a price increase by a single competitor in a market with a dozen competitors, where that competitor turns out to lose market share, that just shows that competition is working, not that it's been injured. Yeah, can I ask you a question about that, because the way I understood antitrust harm re-price increases was that the overall market price increased, not that a, you know, someone in the market increased prices. That's exactly right, and this court's decision in Jacobs says that, of course the Supreme Court in cases like Ohio against American Express, Brook Group talks about super competitive pricing in the market, yeah, so that's Hornbook antitrust law, that's exactly right, and so the plaintiffs. Because the concern is inter-brand competition, not intra-brand, right? Precisely, that's precisely right, yes, your honor, and this court's decision in Spanish Broadcasting makes that point as well, it says you can't show a harm to competition by showing harm to intra-brand competition unless, except in the unusual circumstances where you have some actual evidence of a mechanism by which intra-brand competition is essential to inter-brand competition, and there's no such evidence here. The plaintiffs claim that OJC was an aggressive discounter, and that somehow this had an impact on the market as a whole, in the first place, the idea that a seller of one percent of one of a dozen competitors' products in a market with hundreds of retailers, the determination of which of that one retailer is going to make any difference is nonsensical, but in any event, they don't even have evidence that OJC was an aggressive discounter as to KidKraft wooden play kitchens, and they just say it was an aggressive, its policy was to be an aggressive discounter, they don't have any evidence about its pricing with respect to KidKraft wooden play kitchens in particular, and again, in Dr. Beltouros, our expert's rebuttal declaration, he put in evidence showing that, in fact, if you look at the available information from a handful of retailers for whom we had specific data, in fact, over the relevant time period, OJC was almost never the lowest price offer of particular KidKraft products. So even that allegation... One thing about this case that, and you raised this in your brief, although the district court ruled against you below, that seems odd to me, is the definition of the market. What evidence do you have, I guess two questions about that, what evidence do you have that the market should be defined to include plastic play kitchens, non-wood play kitchens, and if we did say the market was broader than wooden play kitchens, what market share would you have in that market? Since we didn't challenge on appeal, as one of the alternative grounds, that particular ruling by the district court, although we certainly disagree with it, I must confess I'm not well prepared to answer that question, but Dr. Beltouros... Your position is you win anyway, even if you define that market that narrowly. Yes, but it is true. So for instance, the VEET declaration, it's H-V-I-D-T, which is one of the declarations in support of our motion for summary judgment, attaches as appendix four a list of all the accounts that KidKraft, at major retailers, that KidKraft lost during the relevant period, and if you refer to that appendix, some of the accounts that KidKraft lost were to plastic kitchen manufacturers. So that certainly suggests that from the standpoint of major retailers, they view wooden and plastic play kitchens as interchangeable, and Dr. Beltouros' reports also go through substantial additional evidence of why it is that actually there's no dispute, no material factual dispute on this question, that the market should include plastic play kitchens as well, and he also has statistics showing KidKraft's market share if you apply the broader market, which I believe, my recollection is it's maybe in the 40% or less range, but I could be mistaken. If the court has no further questions, we ask that the judgment be affirmed. Oh, thank you, Mr. Hungar. Mr. Friedman, I always like it when times return to me. Your Honor, I think there's two important things. One is that there are two claims in this case, OJ Commerce and Naomi Home, right? The retailer of KidKraft's products as well as the competitor to KidKraft itself, Naomi Home, which was creating a competing kitchen. That competitor was also Naomi Home, and that competitor was ousted from the market and excluded from the market by the anti-competitive actions of KidKraft, including its telling its, at the time, only retailer that if it continued selling its product, it would cut the retailer off. And so you have a dominant manufacturer threatening a retailer to exclude a competitor. I want to point something else out, which is the court commented when Mr. Hungar was arguing that, well, it was only a price increase in KidKraft kitchens. I think the court needs to remember that KidKraft represents at least 70% of the market. And so if the court's position is that a monopolist can leverage its monopoly power to exclude – My position is that you have to look at this market-wide and not a particular brand. Right. But when that brand constitutes 70% of the entire market, and I understand the court's point about whether the market should be expanded, but that wasn't raised – Yeah, yeah. You don't have to worry about that. Okay. So, you know, if we're looking at the market of wooden plate kitchens and that competitor is 70% of that market, then an increase in price for 70% of that market is a market-wide price increase, right? Essentially, Your Honor, you'd be making it impossible for an antitrust plaintiff to bring an antitrust claim if they can't use the increase of 70% of the market as sufficient because that's the monopoly. Coupled with evidence that their sales are declining and that your clients are increasing after the complaint about conduct. I mean, Your Honor, on a tiny, tiny scale, right, they started off as a 75% monopolist and I think it was in 2016, and then now they're at 71. I mean, they're not really losing market share, tiny, a tiny bit. And so, and yes, obviously, as we're slowly, slowly getting a little bit more market share, but again, the via media case from the Seventh Circuit lays out three factors for an Aspen skiing case and says nothing more is required. There isn't a requirement that competition, that it is a necessity for competition to exist and this court's same case in Duty Free America's versus Aste Lauder doesn't hold that there is a requirement for competition to exist when it lays out the factors of an Aspen skiing claim. I don't think it should be this court's position that a monopolist can leverage its monopoly power to exclude a competitor and that that conduct results in 70% of the market having an increased price through references to actual financial data showing that and through internal KidCraft documents showing that the price went up for 70% of the market and then that should be legal. Okay, I think we understand your case, Mr. Friedman. Thank you for your argument.